UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

CARLENE GARDNER as PERSONAL
REPRESENTATIVE OF THE ESTATE OF
WILLIE GARDNER, JR.,

      Plaintiff,

v.

CARNIVAL CORPORATION,
DR. NOMBUSO NOLUTHANDO AFRICANDER,
VIPIN CHETHIKKATTU NIKARTHIL, RN,
DR. JOHN DOE, and JANE DOE, RN,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, CARLENE GARDNER as PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIE GARDNER, JR., and sues the Defendants, CARNIVAL CORPORATION; DR. NOMBUSO NOLUTHANDO AFRICANDER; VIPIN CHETHIKKATTU NIKARTHIL, RN; DR. JOHN DOE and JANE DOE, RN, and alleges as follows:

## THE PARTIES

1. Plaintiff, CARLENE GARDNER as PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIE GARDNER, JR., is a citizen of Tennessee and is in all respects *sui juris*.

2. At all times material CARLENE GARDNER was the lawful wife of WILLIE GARDNER, JR. ("Decedent") and were living as husband and wife.

3. Plaintiff, CARLENE GARDNER brings this action on behalf of the Decedent's Estate.

4.  Defendant, CARNIVAL CORPORATION (hereinafter "CARNIVAL"), is a corporation incorporated under the laws of Panama with its principal place of business and worldwide headquarters in Miami, Florida.

5.  At all times material, CARNIVAL is a common carrier engaged in the business of marketing, selling, and operating a cruise line out of various ports within the continental United States, including Miami, Florida.  CARNIVAL derives substantial revenues from cruises originating and terminating in various ports in the State of Florida, including Miami-Dade County, Florida.

6.  Defendant, DR. NOMBUSO NOLUTHANDO AFRICANDER, was the ship's doctor aboard the *Carnival Ecstasy* who saw, examined, treated, and/or was consulted concerning the medical condition of the Decedent while aboard the vessel.  Upon information and belief, DR. NOMBUSO NOLUTHANDO AFRICANDER is a citizen of South Africa.

7.  At all times material, Defendant, DR. NOMBUSO NOLUTHANDO AFRICANDER, was an employee and/or apparent agent of Defendant, CARNIVAL, and/or joint ventures with Defendant CARNIVAL, working aboard the *Carnival Ecstasy* as a ship's physician and acting within the course and scope of said employment, agency and/or joint venture.

8.  Defendant VIPIN CHETHIKKATTU NIKARTHIL, RN, was the ship's nurse aboard the *Carnival Ecstasy* who saw, examined, treated, and/or was consulted concerning the medical condition of the Decedent while aboard the vessel.

9.  Defendants DR. JOHN DOE and JANE DOE, RN, are included to represent the additional ship doctor and nurses who saw, examined, treated, and/or were consulted concerning the medical condition of the Decedent while aboard the *Carnival Ecstasy*.  The true identities of these individuals are not yet known to Plaintiff but are in the exclusive possession of Defendant CARNIVAL.  Upon receipt of these individuals' true identities, Plaintiff will amend her

Complaint to accurately name them as Defendants.

10. At all times material, CARNIVAL employed and/or contracted with the vessel's doctor and nurses, including Defendants, DR. NOMBUSO NOLUTHANDO AFRICANDER and VIPIN CHETHIKKATTU NIKARTHIL, RN (referred to as the "Medical Defendants"), who worked aboard the *Carnival Ecstasy* and provided medical care to the Decedent.

## JURISDICTION AND VENUE

### Venue

11. The matter in controversy exceeds, exclusive of interests and costs, the sum specified by 28 U.S.C. § 1332.  As such, this matter falls under the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332.  In the alternative, if diversity jurisdiction does not apply, then this matter falls under the admiralty and maritime jurisdiction of this Court.

12. This action is being pursued in this Court, as opposed to state court as otherwise allowed by the Saving to Suitors Clause of 28 U.S.C. §1333, because CARNIVAL unilaterally inserts a forum clause into its cruise tickets that require its passengers to file cruise-related suits *only in this federal district and division,* as opposed to any other place in the world.

### Jurisdiction over Defendant CARNIVAL

13. CARNIVAL, at all material times, personally or through an agent:

   a.  Operated, conducted, engaged in, or carried on a business venture in this state and/or county or had an office or agency in this state and/or county;

   b.  Was engaged in substantial activity within this state;

   c.  Operated vessels in the waters of this State;

   d.  Committed one or more of the acts stated in Florida Statutes §§ 48.081, 48.181, or 48.193;

   e.  The acts of CARNIVAL set out in this Complaint occurred in whole or in part in this county and/or state; and/or

f.   Issued a cruise line ticket to the Plaintiff that required a suit be brought in this Federal District and Division against CARNIVAL in this action.

### Jurisdiction over Medical Defendants

14. At all times material hereto, the Medical Defendants engaged in substantial and not isolated activities in Florida.  Such activities and contacts, assessed over a period of time and considered collectively, establish jurisdiction under Florida's long-arm statute, § 48.193, based on the following:

a.   The Medical Defendants agreed to insure CARNIVAL, an entity located in Florida, for foreseeable risks.  Specifically, Medical Defendants entered into agreements with CARNIVAL, a Florida-based entity, to indemnify it and insure it.  As such, because the Medical Defendants contractually agreed to indemnify CARNIVAL, a Florida-based entity, for any harm resulting from their services, including medical malpractice, the Medical Defendants agreed to insure a person and/or risk in Florida under Florida Statute § 48.193(1)(a)(4).  § 48.193(1)(a)(4) provides that "any person… who contracts to insure any person, property, *or* risk located in Florida" is subject to the jurisdiction of Courts in Florida. *Id.*

b.   The Medical Defendants appointed CARNIVAL as their exclusive agent in Florida, giving CARNIVAL complete control of all claims brought against them in Florida.  In consideration of working as a ship's doctor for Florida-based CARNIVAL, the Medical Defendants signed indemnity agreements with CARNIVAL.  In the indemnity agreement, the Medical Defendants appointed CARNIVAL and CARNIVAL's insurer as their exclusive agent, giving CARNIVAL complete control of the defenses of all proceedings against the Medical Defendants.  By virtue of such appointments and giving CARNIVAL a *quasi*-power of attorney, the Medical Defendants purposefully directed their activities to this forum.   In this case, under the aforementioned agreement, Florida-based CARNIVAL controls and pays for the Medical Defendants' attorney(s) in Florida.

c.   At all times material hereto, the Medical Defendants have worked as a ship doctor and/or nurse aboard CARNIVAL's vessels (and/or other cruise lines' vessels), while the vessels were in Florida ports.  During each of these times, while the vessel was in a Florida port or in Florida territorial waters, the Medical Defendants were expected to and/or did in fact practice medicine and provide medical care to passengers and crew in Florida.  As such, the harm resulting from the Medical Defendant's services performed in Florida was a foreseeable risk, for which the Medical Defendants insured CARNIVAL in Florida.  As stated, this grants the Court personal jurisdiction over the Medical Defendants under Florida Statute § 48.193(1)(a)(4).  Alternatively, the Medical Defendant's continuing agreements to insure Florida-based CARNIVAL should be considered collectively with all of the Medical Defendants' other contacts (as described herein) to establish jurisdiction under Florida's general jurisdiction statute § 48.193(2).

d.  At all times material hereto, upon information and belief, the Medical Defendants maintained active bank accounts in Florida and/or the United States and earned taxable income from these accounts and/or were paid from bank accounts in Florida.

e.  At all times material hereto, the Medical Defendants provided medical care to passengers and crew in Florida ports and/or in Florida territorial waters while working and being compensated as shipboard medical providers.

f.  At all times material hereto, the Medical Defendants received medical training and continuing medical instruction in Florida.

g.  At all times material hereto, the Medical Defendants knowingly and purposefully reached out to CARNIVAL (and/or other cruise lines) in Florida and entered into long-term business arrangements with these Florida entities to provide medical services to cruise passengers for profit.

h.  All payments of the Medical Defendant's earnings from Florida-based CARNIVAL were processed by the cruise line in Florida.

i.  While working as a shipboard medical provider for profit on CARNIVAL's vessels, CARNIVAL's Medical Department in Miami, Florida instructed the Medical Defendants to consult with contracted hospitals, medical professionals, and/or specialists in Miami, Florida for medical consultations and when providing medical services including, but not limited to, rendering diagnosis and treatment to cruise passengers and crew.

j.  While working as a ship doctor for profit on CARNIVAL's vessels, the Medical Defendants knowingly and purposefully consulted with hospitals, medical professionals, and/or specialists in Miami, Florida, and relied on those medical opinions to provide medical services to cruise passengers and crew.

k.  The Medical Defendants will continue to consult with and rely on hospitals and their medical professionals and/or specialists in Miami, Florida to provide medical services to cruise passengers and crew for profit.

l.  All payments of the Medical Defendants' earnings from Florida-based CARNIVAL (and/or other Florida-based cruise lines) were processed by the cruise line(s) in Florida.

m.  At all times material hereto, the Medical Defendants (acting in consultation and in concert with CARNIVAL officials/employees located in Miami, Florida) failed to provide the Decedent with adequate medical care he required given his condition.  Accordingly, the facts giving rise to the causes of action in this incident took place, in part, in Florida, thereby also giving this Court specific jurisdiction over the Medical Defendants.

n.  At all times material hereto, the Medical Defendants entered into a contract with Florida-based CARNIVAL concerning their employment aboard CARNIVAL's vessel(s), which

(a) contains a choice-of-law clause designating Florida law as the governing law; (b) contains a provision whereby the Medical Defendants agreed to submit to the exclusive jurisdiction of the courts of Florida; (c) involves consideration of not less than $250,000 or relate to an obligation arising out of a transaction involving in the aggregate not less than $250,000; (d) does not violate the U.S. Constitution; and (e) has at least one party of the contract that is a resident of Florida or incorporated under the laws of Florida. Therefore, the contract between CARNIVAL and the Medical Defendants meets all requirements to satisfy a finding of specific jurisdiction under Florida Statute § 48.193(1)(a)(9).

o.   At all times material hereto, the Medical Defendants' arrangements with the Florida-based cruise lines and the circumstances of this case are markedly different from those at issue in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).  Herein, unlike *Daimler*, Plaintiff is suing a Florida-based cruise line (CARNIVAL) for injuries sustained as a result of the improper medical treatment rendered by agents of the cruise line (the Medical Defendants).  Further unlike *Daimler*, CARNIVAL is "at home" in this jurisdiction because CARNIVAL maintains its principal place of business in Florida.  Thus, under *Daimler*, the Medical Defendants are also deemed "at home" in this jurisdiction by their direct and indirect contacts with Florida (through the Florida-based cruise lines).

p.   At all times material hereto, the Medical Defendants are also subject to jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2) because (a) the instant maritime tort claims arise under federal law; (b) the Medical Defendants are not subject to jurisdiction in any state's courts of general jurisdiction; and (c) exercising jurisdiction over the Medical Defendants is consistent with the United States Constitution and laws, based on the Medical Defendants' minimum contacts with the United States as a whole, such that the maintenance of this lawsuit does not offend traditional notions of fair play and substantial justice.  These minimum contacts are set forth in the above allegations and include, but are not limited to, the Medical Defendants' renting and/or owning property in the United States, the Medical Defendants' location and employment aboard cruise ships that visit ports throughout the United States, and the Medical Defendants providing (and/or is expected to provide) medical care to passengers while the cruise ships are visiting ports throughout the United States.

15. Defendants are subject to the jurisdiction of the Courts of this State.

16. The causes of action asserted in this Complaint arise under the General Maritime Law of the United States.

## FACTS COMMON TO ALL COUNTS

17. At all times material, CARNIVAL owned, managed, operated, maintained, supervised and/or controlled, or was the owner *pro hac vice* and/or charterer of the ocean-going passenger vessel known as the *Carnival Ecstasy*.

18. CARNIVAL, as a common carrier, was engaged in the business of providing to the public, for compensation, vacation cruises aboard the vessel *Carnival Ecstasy*.

19. As part of providing vacation cruises, CARNIVAL advertised, marketed, and promoted that a competent physician and medical center are available in the event passengers need medical care for customary charges.[1]  CARNIVAL further advertised, marketed, and promoted that as a member of the Cruise Line International Association, it had adopted the Cruise Industry Passenger Bill of Rights which guarantees its passengers, including the Decedent, the right to have "full-time, professional emergency medical attention."[2]

20. CARNIVAL employed and/or contracted with the medical staff, including the Medical Defendants, onboard the vessel in connection with its operation of the vessel as part of CARNIVAL's business of operating cruise ships and not solely for the convenience of passengers.

21. At all times material, CARNIVAL relied upon and directed the medical staff, including the Medical Defendants, to perform specified duties to assist them in complying with its regulatory duties and obligations including, but not limited to, those set forth by the U.S. Public Health Service, Drug Enforcement Agency, Coast Guard and Center for Disease Control. CARNIVAL also relied upon and directed medical staff to fulfill the requirements of the

---

[1] https://help.carnival.com/app/answers/detail/a_id/1136/~/medical-services

[2] https://www.carnival.com/about-carnival/legal-notice/passenger-bill-of-rights.aspx

vessel's flag state, to carry a licensed physician as well as those of the United States under both the Cruise Vessel Safety and Security Act and the general maritime requirement of maintenance and cure owed to its seamen operating the vessel.

22. At all material times, CARNIVAL charged money to passengers for the medical services it provided.  Thereby, CARNIVAL is in the business of providing medical services to passengers for profit, and/or CARNIVAL is in the business of operating a floating hospital for its own profit. Herein, CARNIVAL charged Decedent a fee for the medical treatment performed by the medical staff, including Medical Defendants, aboard its vessel and for the medicine provided to the Decedent.  All of the charges for the medical treatment and medicine were charged to Decedent.

23. Overall, CARNIVAL is in the business of providing medical care.  Like other amenities offered aboard its vessels, CARNIVAL also offers passengers modern medical facilities onboard its ships for profit. *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1244 n. 14 (11th Cir. 2014).

24. At all times material hereto, CARNIVAL owned, operated, managed, maintained, and/or controlled the medical equipment in the ship's medical center aboard the vessel *Carnival Ecstasy*.

25. At all times material hereto, CARNIVAL had the ability to monitor and control each and every step taken by any crewmember, including the Medical Defendants, working in the medical department via telephone, videoconference, Skype, or otherwise.  This technology is generally referred to as "Face to Face Telemedicine."  Such modern means of communication make the location of the cruise ship effectively irrelevant and allow CARNIVAL to directly control the medical care on the ship.

26. At all times material hereto, CARNIVAL monitored and oversaw the medical care of

passengers and crew provided by the medical staff, including the Medical Defendants, including diagnosis, treatment, and emergency medical evacuation via "Face to Face Telemedicine" or other modern means of communication which make the location of the cruise ship effectively irrelevant and allows CARNIVAL to directly control the medical care on the ship.

27. At all times material hereto, the Medical Defendants were in the regular, full-time employment of the ship, as salaried members of the crew, subject to the ship's discipline, the Master's orders, and under the control of CARNIVAL's shoreside medical department located in Miami, Florida, through modern means of communication such as "Face to Face Telemedicine."

28. At all times material hereto, CARNIVAL had the right to fire the Medical Defendants.

29. At all times material hereto, CARNIVAL was responsible and liable for the actions of the Medical Defendants with respect to the treatment, or lack of treatment, of the Decedent based on a theory of *respondeat superior* and/or under the principle of apparent agency.

30. At all times material hereto, the Medical Defendants were a direct employee and/or apparent agent of CARNIVAL, and at all times acted within the course and scope of their employment, agency agreement or relationship.

31. At all times material hereto, the Medical Defendants represented to the Decedent and the ship's passengers as an employee of CARNIVAL in that the Medical Defendants:

   a. Worked in the medical center aboard the vessel, which was owned and/or operated by CARNIVAL;

   b. Wore a uniform provided by CARNIVAL;

   c. Represented themselves as the "ship's medical crew" to the Decedent;

   d. The ship's doctor was called a ship's officer by CARNIVAL, the ship's officers, and the

crew;

e.  Ate with the ship's crew;

f.  Was under the commands of the ship's officers and followed all of the Master's rules and regulations;

g.  Charges for medical treatment and medicine directly to the passenger's onboard credit program, or the equivalent shipboard credit card, linked to CARNIVAL;

h.  Literature provided by CARNIVAL and its representatives showed the doctor(s) and nurse(s) as crewmembers and employees of CARNIVAL;

i.  Wore CARNIVAL insignias in various places inside the ship's medical center where the medical staff worked;

j.  Was employed full-time by CARNIVAL;

k.  Was paid a salary by CARNIVAL; and

l.  Spoke to the Decedent as though they had the authority to do so by CARNIVAL.

32. At no time did CARNIVAL represent to the Decedent in particular, or the ship's passengers in general, in any meaningful way, that the Medical Defendants were not agents or employees of CARNIVAL.

33. The Decedent reasonably relied on the representation of CARNIVAL that the Medical Defendants were employed by CARNIVAL and that the vessel had a medical center staffed to provide passengers with "full-time, profession emergency medical attention" as guaranteed in the Passenger Bill Rights adopted by CARNIVAL. This reliance was detrimental because it resulted in the Plaintiff and Decedent deciding to book and participate in the cruise, presenting to the infirmary, and receiving improper and/or substandard medical treatment. Had the Decedent not detrimentally relied on the representations of CARNIVAL and the negligent medical treatment given by the Medical Defendants, Decedent would not have been injured as described herein.

34. At all times material hereto, CARNIVAL knew of the Medical Defendants' agency

representations and allowed them to represent themselves as such.

### The Subject Incident

35. On or about May 2, 2022, Plaintiff and Decedent booked the subject cruise to celebrate their 50th Wedding Anniversary.  They were traveling with thirteen family members who were joining them in the celebration.

36. At the time of booking, Decedent requested a handicapped stateroom due to his mobility issues. CARNIVAL refused to provide him with a handicapped stateroom because he was not confined to a wheelchair full-time.

37. Prior to sailing Decedent obtained and provided Fit to Sail letters from his treating doctor(s) which CARNIVAL accepted.

38. On or about July 21, 2022, Decedent was attempting to return to his stateroom using a scooter. Because he was not assigned a handicapped stateroom, the scooter would not fit in the cabin. As Decedent was getting off of the scooter to go into his stateroom he collapsed.

39. Decedent's family members, which included two nurses and other members in the medical field, placed Decedent's mask from his CPAC machine on him in order to provide him with oxygen.  The Decedent's family members, along with a fellow passenger who identified herself as a CPR instructor, performed CPR.  The decedent regained consciousness and was breathing and responsive.  In an abundance of caution, the mask from his CPAC machine remained on Decedent.

40. While CPR was being performed, Decedent's family members called 911 multiple times to no avail.  After an extended period of time, they finally received a return phone call.  The family reported that there was a medical emergency and specifically that Decedent was having trouble breathing.

41. Emergency medical personnel failed to timely respond to the scene. Due to the delayed arrival of medical personnel, a Good Samaritan passenger ran to report the incident to the front desk and obtain medical assistance.

42. The Nurse who eventually arrived on the scene commented that there was a delay in responding because the medical personnel were busy testing employees for Covid before allowing them back on the vessel. This statement was overheard by independent witness(es).

43. The first medical personnel to arrive was observed to be walking down the hallway with no sense of urgency. Family members screamed for the responder to hurry up.

44. Over the family's objections, this crewmember had the Decedent removed from the CPAC oxygen and moved into the hallway. After being removed from the oxygen source, Decedent exhibited a blank stare, then began gasping for breath and fell unconscious, never to awake again.

45. Once Decedent was moved into the hallway the medical personnel did not immediately provide him with oxygen. Family members cried for oxygen to be given to Decedent. Finally, a crewmember arrived on the scene with an oxygen tank. The oxygen mask was placed on Decedent but the oxygen was not turned on. When a family member asked why oxygen was not flowing, the crewmember stated he did not have the key to turn it on. From the time he was disconnected from the CPAC machine until his death, oxygen was never provided to Decedent.

46. Eventually the ship's doctor arrived on the scene. However once on the scene, lifesaving medical care was not properly administered. There was a delay in administering Epinephrine, which, when administered, was done in the wrong manner, the wrong dosage was used for responding to a cardiac event, and it was not administered with the correct frequency.

47. Passengers, who identified themselves as a trauma doctor and a trauma nurse, offered assistance but their assistance was refused.

48. Overall, the treatment that the Decedent received aboard the *Carnival Ecstasy* fell below the standard of care, was mismanaged, inadequate, and was unreasonably delayed.  All of which directly led to the worsening of the Decedent's medical condition and ultimately his death.

49. To the family's shock and horror, after the Decedent's demise, a white sheet was placed on his body (but not face) and he was left to lay in the hallway, in full view of his family and others passengers for almost two hours.

## <u>COUNT I – WRONGFUL DEATH NEGLIGENCE</u><br><u>AGAINST THE MEDICAL DEFENDANTS</u>

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through forty-nine (49) as though alleged originally herein.

50. At all times material hereto, it was the duty of the Medical Defendants to provide the Decedent with reasonable care under the circumstances.  This duty of reasonable care includes the duty to provide prompt, proper, and appropriate medical care for the Decedent's conditions which does not fall below the applicable standard of medical care for cruise ship doctors and nurses and to further supervise and the medical care and treatment rendered by nurses and other medical personnel under their authority in the medical center.

51. On or about July 21, 2022, the Medical Defendants breached their duty to provide the Decedent with reasonable care under the circumstances through the following acts and/or omissions:

 a. Failure to timely respond to the medical emergency;

 b. Prioritizing routine Covid testing over the needs of a medical emergency;

 c. Failure to timely respond to the scene of the medical emergency with the necessary medical equipment, including but not limited to an oxygen tank capable of working;

    d.   Negligently removing the Decedent from his oxygen source;

    e.   Failure to properly and timely administer emergency medical care in accordance with American Heart Association Adult Cardia Arrest Algorithm;

    f.   Failure to timely and properly administer Epinephrine in the correct dosage, amount and frequency;

    g.   Failure to properly administer CPR;

    h.   Failure to recognize and appreciate the seriousness and gravity of the Decedent's condition under the circumstances;

    i.   Failure to understand and react effectively to Decedent's medical needs given the circumstance;

    j.   Failure to practice medicine according to generally accepted standards of care;

    k.   Failure to adhere and refer to CARNIVAL's policies and procedures;

    l.   Failure to adhere to industry standards including but not limited to the American College of Emergency Physicians Cruise Ship Guidelines; and

    m.   Breaching the prevailing professional standard of care for said health care providers, to wit: that level of care, skill and treatment which, in light of all relevant surrounding circumstances as recognized as acceptable and appropriate by a reasonably prudent similar health care provider.

52. The above acts and/or omissions caused and/or contributed to the Decedent's injuries, significantly worsening his condition and dramatically decreasing his chances of survival, ultimately leading to his death.

53. As a direct and proximate result of the Medical Defendants' incompetence and lack of proper medical care, Decedent was injured, suffered physical pain and suffering, mental anguish, and his chances of survival were dramatically decreased, leading to his death.  The decedent's estate lost the earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.  In addition, Decedent lost the benefit of his vacation, cruise, and transportation costs.

WHEREFORE, Plaintiff demands damages as allowed under the Death on the High Seas Act, 46 USC §30301 et seq. and/or any other applicable wrongful death and/or survival act, including but not limited to pecuniary losses, loss of support, past and future earnings, loss of services, loss of nurture and guidance of family, funeral expenses and all other damages allowable by law.  Plaintiff demands a trial by jury for all issues so triable and any other relief this Court deems proper.

### COUNT II – VICARIOUS LIABILITY AGAINST CARNIVAL FOR MEDICAL NEGLIGENCE BASED ON *RESPONDENT'S SUPERIOR*

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through forty-nine (49) as though alleged originally herein.

54. At all times material hereto, CARNIVAL owned, operated, controlled, and/or maintained the medical center aboard the *Carnival Ecstasy* and was responsible for overseeing the operations of the shipboard medical center including the selecting, purchasing, and maintaining of the medical equipment and medications contained therein; recruitment, credentialing and staffing of shipboard medical centers with physicians and nurses; evaluations, training, and coaching of shipboard physicians; and acting as a resource to the shipboard medical personnel and providing guidance and instruction in the event of a medical emergency in said medical center.

55. At all times material, the Medical Defendants were the ship's doctors and nurses aboard the vessel *Carnival Ecstasy*.

56. At all times material hereto, the Medical Defendants were acting within the scope of their employment or agency.

57. At all times material, the Medical Defendants were agents, servants, and/or employees of CARNIVAL which was therefore vicariously liable for the negligent treatment of the Decedent under the legal principles of *respondeat superior* and the principles set forth in *Franza v. Royal*

*Caribbean Cruise Ltd.*, 772 F.3d 1225 (11th Cir. 2014).

58. At all times material, CARNIVAL acknowledged that the Medical Defendants would act on CARNIVAL's behalf, and the medical personnel accepted the undertaking, based on the following:

   a.  The Medical Defendants worked in the medical facility which was created, owned, and/or operated by CARNIVAL;

   b.  CARNIVAL's logo and insignias were displayed in various places throughout the medical facility;

   c.  CARNIVAL's website publicly described the medical facility in a proprietary language, including, but not limited to, "our medical centers…"

   d.  CARNIVAL billed and collected payments directly from passengers for the medical services provided by the Medical Defendants and CARNIVAL did so through passengers' onboard accounts with CARNIVAL;

   e.  The Medical Defendants were employed full-time by CARNIVAL;

   f.  The Medical Defendants were paid a salary by CARNIVAL;

   g.  The Medical Defendants wore uniforms and/or nametags which were provided by CARNIVAL and had CARNIVAL's name and logo;

   h.  The Medical Defendants referred to themself as crewmembers and CARNIVAL referred to the Ship's Doctors as ship's officers;

   i.  The Medical Defendants were under the commands of the ship's officers and followed all of the Master's rules and regulations; and

   j.  The Medical Defendants spoke to Decedent as though they had the authority to do so by CARNIVAL.

59. At all times material, the Medical Defendants were subject to the control and/or right to control by CARNIVAL based on the allegations set forth in the preceding paragraph along with the following:

   a. The Medical Defendants were employed full-time by CARNIVAL, paid a salary by CARNIVAL, and worked in the medical facility created, owned, and/or operated by CARNIVAL;

b. CARNIVAL stocked and equipped the medical facility and, as such, the equipment and medications necessary for the medical personnel to perform their work were furnished by CARNIVAL;

c. The Medical Defendants were subject to CARNIVAL's training requirements and were under the commands of CARNIVAL's ship's officers and the Master's rules and regulations;

d. CARNIVAL had the right to fire the Medical Defendants;

e. Setting the standards, criteria, and procedures for selecting and hiring said personnel;

f. Acting as a resource to the shipboard medical personnel, and providing guidance and instruction in the event of a medical emergency;

g. Establishing, adopting, and enforcing rules, regulations, and protocols for the treatment of patients at its medical center and aboard its vessels;

h. Establishing and enforcing the terms of employment for such personnel, including their hours, job duties, and the details of their work;

i. Setting the standards and criteria to determine which patients were to be treated by said personnel;

j. Determining and setting the specific charges for treatment for its passengers and requiring that all such charges be paid directly to CARNIVAL on the passenger's shipboard charge card;

k. Supplying the tools, workplace, and equipment for said personnel to perform their job duties; and

l. Determining and selecting the medications, drugs, and supplies to be used in the ship's medical center; purchasing said medications, drugs, and supplies to stock the medical center; setting the prices for the use and or sale of such medications, drugs, and supplies to passengers and requiring the passengers to pay CARNIVAL directly for such medical, drugs and supplies on their shipboard charge cards.

60. At all times material, CARNIVAL acknowledged that the Medical Defendants would act on CARNIVAL's behalf, and the Medical Defendants accepted the undertaking.

61. At all times material, CARNIVAL had a duty to provide the Decedent with reasonable care under the circumstances.

62. At all times material, the Medical Defendants owed a duty to provide the Decedent with reasonable care under the circumstances.

63. CARNIVAL is vicariously liable under the principles of *respondeat superior,* for the acts and omissions of its employees, servants, agents, ostensible agents, and/or representatives, including but not limited to the medical staff, and breached its duty to exercise reasonable care under the circumstances owed to the Decedent as follows:

   a. Failure to timely respond to the medical emergency;

   b. Prioritizing routine Covid testing over the needs of a medical emergency;

   c. Failure to timely respond to the scene of the medical emergency with the necessary medical equipment, including but not limited to an oxygen tank capable of working;

   d. Negligently removing the Decedent from his oxygen source;

   e. Failure to properly and timely administer emergency medical care in accordance with American Heart Association Adult Cardia Arrest Algorithm;

   f. Failure to timely and properly administer Epinephrine in the correct dosage, amount, and frequency;

   g. Failure to properly administer CPR;

   h. Failure to recognize and appreciate the seriousness and gravity of the Decedent's condition under the circumstances;

   i. Failure to understand and react effectively to Decedent's medical needs given the circumstance;

   j. Failure to practice medicine according to generally accepted standards of care;

   k. Failure to adhere and refer to CARNIVAL's policies and procedures;

   l. Failure to adhere to industry standards including but not limited to the American College of Emergency Physicians Cruise Ship Guidelines; and

   m. Breaching the prevailing professional standard of care for said health care providers, to wit: that level of care, skill and treatment which, in light of all relevant surrounding circumstances as recognized as acceptable and appropriate by a reasonably prudent similar health care provider.

64. The above acts and/or omissions caused and/or contributed to the Decedent's injuries, significantly worsening his condition and dramatically decreasing his chances of survival, ultimately leading to his death.

65. As a direct and proximate result of the Medical Defendants' incompetence and lack of proper medical care, for which CARNIVAL is vicariously liable, Decedent was injured, suffered physical pain and suffering, mental anguish, and his chances of survival were dramatically decreased, leading to his death.  The decedent's estate lost the earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.  In addition, Decedent lost the benefit of his vacation, cruise, and transportation costs.

WHEREFORE, Plaintiff demands damages as allowed under the Death on the High Seas Act, 46 USC §30301 et seq. and/or any other applicable wrongful death and/or survival act, including but not limited to pecuniary losses, loss of support, past and future earnings, loss of services, loss of nurture and guidance of family, funeral expenses and all other damages allowable by law.  Plaintiff demands a trial by jury for all issues so triable and any other relief this Court deems proper.

## COUNT III - VICARIOUS LIABILITY AGAINST CARNIVAL FOR MEDICAL NEGLIGENCE BASED ON APPARENT AGENCY

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through forty-nine (49) as though alleged originally herein.

66. At all times material, CARNIVAL held out its medical staff, including the Medical Defendants, as being its employees who work in CARNIVAL's "medical centers" on the vessel.  CARNIVAL promotes its medical staff and represents them as being its employees

through brochures, internet advertising, and on the vessel. CARNIVAL held out its staff, including the Medical Defendants, as being a direct employee or its agent.

67. CARNIVAL promotes the idea that the medical staff who work in its "medical centers" are employed by CARNIVAL as part of a marketing tool to induce passengers, such as the Decedent, to buy cruises on its ships, particularly because the cruise line goes to various foreign ports that may not have adequate medical care.

68. CARNIVAL manifested to the Plaintiff and Decedent in this case that its medical staff were acting as its employees and/or agents in various ways, including but not limited to the following:

   a. The doctors and nurses worked at what CARNIVAL describes in its advertising as its "medical centers";

   b. The "medical centers" are owned and operated by CARNIVAL, which pays to stock the "medical centers" with all supplies, various medicines, and equipment;

   c. The passenger is billed directly by CARNIVAL through the passengers' Sail Card, whereas the "medical staff," including the doctor and nurses, are paid salaries and commission by CARNIVAL to work in the "medical centers";

   d. Medical records and forms, including Passenger Shipboard Statements which are given to guests in the medical center, used CARNIVAL's letterhead and logo;

   e. The medical staff were given uniforms to wear that include name tags, and which have CARNIVAL's name and logo and were required by CARNIVAL to be worn by the medical staff;

   f. Medical staff are considered to be Officers on board the vessel and a member of the crew, and were introduced to the passengers as Ship's Officers and members of the crew;

   g. CARNIVAL put the ship's physician and nurse under the command of the ship's superior officers, including the Master of the ship;

   h. CARNIVAL requires the medical staff to provide services in the ship's "medical center," which is identified as CARNIVAL's facility. The decedent detrimentally relied upon the representations that it was owned and operated by CARNIVAL and staffed with doctors and nurses, who had been selected and vetted by CARNIVAL. The decedent would not have authorized the medical staff to treat him if they had known that the medical staff

were not employees of CARNIVAL;

i.   There were CARNIVAL's insignias and logos in various locations throughout the medical center; and/or

j.   The medical staff spoke to the Decedent as though they had the authority to do so on behalf of CARNIVAL.

69. At no time did CARNIVAL represent to the Plaintiff and Decedent in particular, or the ship's passengers in general, in any meaningful way that the Medical Defendants were not agents or employees of CARNIVAL.

70. CARNIVAL is estopped to deny that the Medical Defendants were its apparent agents and/or apparent employees and/or apparent servants.

71.  At all times material, Plaintiff and Decedent detrimentally relied upon the above-described representations of CARNIVAL by purchasing and participating in the subject cruise and by seeking and following the medical advice and accepting the treatment provided by Medical Defendants, reasonably believing that because it was owned and operated by CARNIVAL, the Medical Defendants were its employees and had been properly vetted, selected and trained and were well-qualified.

72. At all times material hereto, the Plaintiff and Decedent relied upon the above-described representations of CARNIVAL, which gave rise to his reasonable belief that the Medical Defendants were its agents and/or employees, which induced his reliance upon such appearance of agency and accordingly, CARNIVAL is vicariously liable for the negligence of its apparent agents in treating Decedent and set forth above incorporated herein by reference under the principles of apparent agency set forth in *Franza v. Royal Caribbean Cruise Ltd.*, 772 F.3d 1225 (11th Cir. 2014).

73. CARNIVAL is vicariously liable under the principles of apparent agency for the acts and

omissions of its apparent agents, servants, and employees, including but not limited to the

Medical Defendants, and breached its duty to exercise reasonable care under the circumstances

owed to the Decedent as follows:

a.  Failure to timely respond to the medical emergency;

b.  Prioritizing routine Covid testing over the needs of a medical emergency;

c.  Failure to timely respond to the scene of the medical emergency with the necessary medical equipment, including but not limited to an oxygen tank capable of working;

d.  Negligently removing the Decedent from his oxygen source;

e.  Failure to properly and timely administer emergency medical care in accordance with American Heart Association Adult Cardia Arrest Algorithm;

f.  Failure to timely and properly administer Epinephrine in the correct dosage, amount and frequency;

g.  Failure to properly administer CPR;

h.  Failure to recognize and appreciate the seriousness and gravity of the Decedent's condition under the circumstances;

i.  Failure to understand and react effectively to Decedent's medical needs given the circumstance;

j.  Failure to practice medicine according to generally accepted standards of care;

k.  Failure to adhere and refer to CARNIVAL's policies and procedures;

l.  Failure to adhere to industry standards including but not limited to the American College of Emergency Physicians Cruise Ship Guidelines; and

m.  Breaching the prevailing professional standard of care for said health care providers, to wit: that level of care, skill, and treatment which, in light of all relevant surrounding circumstances is recognized as acceptable and appropriate by a reasonably prudent similar health care provider.

74. The above acts and/or omissions caused and/or contributed to the Decedent's injuries,

significantly worsening his condition and dramatically decreasing his chances of survival,

ultimately leading his death.

75. As a direct and proximate result of the Medical Defendants' incompetence and lack of proper medical care, for which CARNIVAL is vicariously liable, Decedent was injured, suffered physical pain and suffering, mental anguish, and his chances of survival were dramatically decreased, leading to his death.  The decedent's estate lost the earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.  In addition, Decedent lost the benefit of his vacation, cruise, and transportation costs.

WHEREFORE, Plaintiff demands damages as allowed under the Death on the High Seas Act, 46 USC §30301 et seq. and/or any other applicable wrongful death and/or survival act, including but not limited to pecuniary losses, loss of support, past and future earnings, loss of services, loss of nurture and guidance of family, funeral expenses and all other damages allowable by law.  Plaintiff demands a trial by jury for all issues so triable, and any other relief this Court deems proper.

### COUNT IV – WRONGFUL DEATH NEGLIGENCE CLAIM AGAINST CARNIVAL FOR THE ACTS OF THE MEDICAL DEFENDANTS BASED ON THE THEORY OF VICARIOUS LIABILITY UNDER JOINT VENTURE

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through forty-nine (49) as though alleged originally herein.

76. At all times material, CARNIVAL, and the Medical Defendants had the intention to engage in a joint venture to provide medical services to CARNIVAL's passengers.  The intention was established by verbal agreement and/or conduct.  The common purpose of the venture was to profit from providing medical services.

77. At all times material hereto, the Medical Defendants were engaged in a joint venture with CARNIVAL in that they:

a. Had a community of interest in the performance of the common purpose of allowing CARNIVAL to successfully and legally carry out its business model and operations and in the process generate profits;

b. Had a joint right of control with respect to the operation of the medical center aboard the *Carnival Ecstasy*, the provision of medical services and treatment to passengers of said vessel, and compliance with the various regulatory duties of CARNIVAL;

c. Had a right to share in the profits as described herein; and

d. Shared in the losses that may have been sustained as described herein.

78. Some of the facts describing the nature and scope of the joint venture are:

a. At all times material, CARNIVAL was and is engaged in the business of providing cruise vacation experiences to the public.  Because many of its prospective passengers are older, inexperienced foreign travelers and/or worry about the safety of cruises and the potential need to receive medical treatment in foreign countries, the ability to receive proper and qualified medical care is a significant concern of potential customers that CARNIVAL seeks to address in its marketing and promotional activities and through the operation and maintenance of modern medical facilities aboard its vessels staffed with qualified doctors and nurses.

b. At all times material, CARNIVAL also required medical doctors aboard its vessels in order to assist it in complying with its regulatory duties and obligations, including but not limited to those set forth by the U.S. Public Health Service, Drug Enforcement Agency, Coast Guard and Center for Disease Control.  CARNIVAL also required medical doctors aboard its vessels to fulfill the requirements of its flag state to carry a licensed physician as well as of the United States under both the Cruise Vessel Safety and Security Act and the general maritime requirement of maintenance and cure owed to its seamen operating the vessel.

c. In order to carry out the above-described objectives of its business plan and model, and to further allow them to comply with the regulatory requirements imposed by both the flag and port states, CARNIVAL entered into a joint venture with the Medical Defendants to work as the vessel's physician and nurses, and to maintain, operate and supervise the medical center aboard the vessel, treat patients and supervise the medical care provided to the vessel's passengers, including the CARNIVAL's crew, and to assist CARNIVAL in complying with its various regulatory requirements.

d. As part of this joint venture, CARNIVAL established the rates for the treatment of passengers and the sale and use of medicines and supplies used as part of such treatment, which were paid to CARNIVAL by passengers using their shipboard charge cards.  The profits derived from said activities were divided by the Defendants.

e. Each Defendant further profited in other ways from the joint venture.  The joint venture allowed CARNIVAL to carry out its business plan and model to attract passengers to its

ships, which in turn created more potential patients and income for the Medical Defendants. The joint venture also profited the Medical Defendants by opening a new market for their services and creating the potential for them to practice in the extremely lucrative United States medical market.

f.   CARNIVAL and the Medical Defendants invested their own time, money, effort, and other resources into this joint venture, and therefore to the extent that it was not profitable or successful they shared in the losses and/or expenses.

g.   CARNIVAL and the Medical Defendants relied on a single billing system and a unified strategy for CARNIVAL's marketing and advertisements.  CARNIVAL and the Medical Defendants shared profits and losses, and they split revenue from medical services and supplies rendered to CARNIVAL's thousands of cruise passengers.   The Medical Defendants had the sole discretion to render medical care, treatment, and services to passengers and to sell prescription medication and medical supplies to passengers; and the Medical Defendants increased profits by rendering medical care, treatment, and services to passengers and by prescribing passengers medications and supplies.   CARNIVAL's compensation for the Medical Defendants was dependent, at least in part, on the medical facility's revenues; and the medical facility's revenues depended, at least in part, on the recommendations and prescriptions the Medical Defendants provided to passengers. Further, in Florida, a duty to share losses actually and impliedly exists as a matter of law where one party supplies the labor, experience, and skill (like the Medical Defendants), and the other the necessary capital (like CARNIVAL).

h.   CARNIVAL controlled and oversaw certain aspects of the day-to-day operations of the medical facility and medical personnel aboard the vessel.  CARNIVAL exercised control through the monitoring and supervision of its shoreside medical department and through the development of standards, policies, procedures, and guidelines to which it required the Medical Defendants to adhere and also through its constant electronic communication with the medical center wherever the ship sailed throughout the world.   CARNIVAL also maintained control by retaining the ability to terminate, suspend or modify the Medical Defendants' employment if they failed to comply with its rules, regulations, guidelines, and policies.  CARNIVAL controlled and/or had the right to control the marketing of its medical facility and/or the ship's doctors and nurses.

i.   The Medical Defendants controlled and oversaw certain aspects of the day-to-day operations of the medical facilities and medical personnel aboard the vessel.  The Medical Defendants provided the labor through their consultations, treatment, and care to passengers aboard the vessel so as to generate charges to passengers.   The Medical Defendants initiated and/or requested medical evacuations for passengers.   The Medical Defendants completed and/or oversaw the medical personnel's completion of medical records.

j.   CARNIVAL and the Medical Defendants also maintained liability insurance coverage for the activities in the performance of the joint venture with the same P & I club and under the same cover.

79. As joint venturers, CARNIVAL and the Medical Defendants are liable for each other's actions and negligence.  As a result, CARNIVAL is liable for the negligent conduct of the Medical Defendants and damages previously described in this Complaint.  Participants in a joint venture are each liable for the torts of the other or the servants of the joint undertaking committed within the course and scope of the undertaking, without regard to which of the joint venturers actually employed the servant.

80. At all times material, CARNIVAL, and the Medical Defendants had a duty to provide the Decedent with reasonable care under the circumstances, including through the acts of its joint venturers.

81. CARNIVAL and/or the Medical Defendants, through the joint venture breached their duty to exercise reasonable care under the circumstances owed to the Decedent as follows:

   a.  Failure to timely respond to the medical emergency;

   b.  Prioritizing routine Covid testing over the needs of a medical emergency;

   c.  Failure to timely respond to the scene of the medical emergency with the necessary medical equipment, including but not limited to an oxygen tank capable of working;

   d.  Negligently removing the Decedent from his oxygen source;

   e.  Failure to properly and timely administer emergency medical care in accordance with American Heart Association Adult Cardia Arrest Algorithm;

   f.  Failure to timely and properly administer Epinephrine in the correct dosage, amount, and frequency;

   g.  Failure to properly administer CPR;

   h.  Failure to recognize and appreciate the seriousness and gravity of the Decedent's condition under the circumstances;

   i.  Failure to understand and react effectively to Decedent's medical needs given the circumstance;

j.   Failure to practice medicine according to generally accepted standards of care;

k.   Failure to adhere and refer to CARNIVAL's policies and procedures;

l.   Failure to adhere to industry standards including but not limited to the American College of Emergency Physicians Cruise Ship Guidelines; and

m.   Breaching the prevailing professional standard of care for said health care providers, to wit: that level of care, skill, and treatment which, in light of all relevant surrounding circumstances is recognized as acceptable and appropriate by a reasonably prudent similar health care provider.

82. The above acts and/or omissions caused and/or contributed to the Decedent's injuries, significantly worsening his condition and dramatically decreasing his chances of survival, ultimately leading to his death.

83. As a direct and proximate result of the Medical Defendants' incompetence and lack of proper medical care, for which CARNIVAL is vicariously liable, Decedent was injured, suffered physical pain and suffering, mental anguish, and his chances of survival were dramatically decreased, leading to his death.  The decedent's estate lost the earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.  In addition, Decedent lost the benefit of his vacation, cruise, and transportation costs.

WHEREFORE, Plaintiff demands damages as allowed under the Death on the High Seas Act, 46 USC §30301 et seq. and/or any other applicable wrongful death and/or survival act, including but not limited to pecuniary losses, loss of support, past and future earnings, loss of services, loss of nurture and guidance of family, funeral expenses and all other damages allowable by law.  Plaintiff demands a trial by jury for all issues so triable, and any other relief this Court deems proper.

**COUNT V – NEGLIGENT FAILURE TO WARN AGAINST DEFENDANT CARNIVAL**

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through forty-nine (49) as though alleged originally herein.

84. At all times material hereto, it was the duty of CARNIVAL to provide the Decedent with reasonable care under the circumstances.

85. At all times material hereto, it was the duty of CARNIVAL to warn passengers, like Decedent, of dangers that were known, or reasonably should have been known, to CARNIVAL in places where passengers, like Decedent, are invited to or may reasonably be expected to visit.

86. On or about July 21, 2022, the Decedent came under the care of and entrusted his medical well-being to CARNIVAL.

87. On or about July 21, 2022, CARNIVAL and/or its agents, servants, and/or employees breached its duty to warn the Decedent through the following acts and/or omissions:

   a. Failure to warn that Medical Defendants lacked the proper education, licenses, training, experience, and/or skills to promptly and/or adequately provide medical care pertinent to Decedent's emergency and progressive medical condition;

   b. Failure to warn that the Medical Defendants would prioritize routine Covid testing over the needs of a medical emergency;

   c. Failure to warn Medical Defendants lacked training, supervision, and oversight to properly and timely administer emergency medical care in accordance with American Heart Association Adult Cardia Arrest Algorithm;

   d. Failure to warn Medical Defendants lacked training, supervision, and oversight to properly and timely administer Epinephrine in the correct dosage, amount, and frequency;

   e. Failure to warn Medical Defendants lacked training, supervision, and oversight to properly administer CPR;

   f. Failure to warn Medical Defendants lacked training, supervision, and oversight to comply with industry standards including but not limited to the American College of Emergency Physicians Cruise Ship Guidelines

   g. Failure to warn that Defendants lacked and/or failed to enforce adequate policies and

procedures to safely monitor and/or oversee passengers' medical care while under the care of shipboard medical staff; and

h. Failure to warn passengers that Defendants would attempt to disclaim liability for the actions of the shipboard medical staff.

88. The above acts and/or omissions caused and/or contributed to the Decedent's injuries, significantly worsening his condition and dramatically decreasing his chances of survival, ultimately leading to his death that would not have occurred had CARNIVAL, its agents, servants and/or employees adequately warned and/or communicated the foregoing to the Plaintiff and Decedent.

89. At all times material hereto, CARNIVAL knew of the foregoing conditions causing the Decedent's accident and did not correct them.  CARNIVAL's knowledge of the dangerous condition(s) was specifically acquired through prior incidents causing personal injury and/or death to CARNIVAL's passengers including but not limited to *Gaskin v. Carnival Corp.*, case no.: 22-cv-23566-CMA; *Maze v. Carnival Corp.*, 16-cv-21012-DPG; *Bersano v. Carnival Corp.*, case no.: 22-cv-23758-DPG.[3]  Alternatively, the foregoing conditions existed for a sufficient length of time so that CARNIVAL, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.

90. As a direct and proximate result of the Medical Defendants' incompetence and lack of proper medical care, for which CARNIVAL is vicariously liable, Decedent was injured, suffered physical pain and suffering, mental and anguish, and his chances of survival were dramatically decreased, leading to his death.  The decedent's estate lost the earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.  In addition, Decedent lost the benefit of his vacation,

---

[3] The foregoing are just an example of a few of the cases of prior instances known to the Plaintiff.  Upon information and belief many more case will be revealed during the course of discovery.

LIPCON, MARGULIES, & WINKLEMAN, P.A.

cruise and transportation costs.

WHEREFORE, Plaintiff demands damages as allowed under the Death on the High Seas Act, 46 USC §30301 et seq. and/or any other applicable wrongful death and/or survival act, including but not limited to pecuniary losses, loss of support, past and future earnings, loss of services, loss of nurture and guidance of family, funeral expenses and all other damages allowable by law.  Plaintiff demands a trial by jury for all issues so triable and any other relief this Court deems proper.

## COUNT VI – NEGLIGENT HIRING AND/OR RETENTION AGAINST CARNIVAL

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through forty-nine (49) as though alleged originally herein.

91. At all times material hereto, it was the duty of CARNIVAL to provide Decedent with reasonable care under the circumstances.

92. At all times material hereto, CARNIVAL had a duty to select and/or hire properly qualified and competent doctors and nurses.

93. At all times material hereto, as part of its duty to select and/or hire properly qualified and competent doctors and nurses, it was incumbent on CARNIVAL to diligently inquire into the Medical Defendants' qualifications and competency.

94. On or about the above date(s), CARNIVAL, its agents, servants, joint venturers, and/or employees breached its duty to provide the Decedent with reasonable care under the circumstances by selecting and/or retaining the Medical Defendants, which was not properly qualified and/or incompetent based on the following:

   a. The Medical Defendants lacked the proper education, licenses, training, experience, and/or skills to work in an environment, like the vessel's medical facility, including but not limited to:

      i.     A medical degree from a recognized college or university;

      ii.    A good-standing, active, and current medical license;

      iii.   Certificates in ACLS, ATLS, ITLS, BLS, and/or PALS from the recognized educational institution(s);

      iv.   Completion of a recognized medical specialty training program in Emergency Medicine, General Practice, Internal Medicine, Cardiology, and/or General Surgery;

      v.    At least three years of clinical experience in an acute care setting after completion of a recognized medical training program;

      vi.   At least one year of experience in diagnosing and treating a broad range of medical conditions;

      vii.   At least one year of practical experience in Advanced Cardiac Life Support; and/or

      viii.  Intermediate to advanced verbal and written level of English;

b.  The Medical Defendants lacked the proper education, licenses, training, experience, and/or skills to implement and/or follow an adequate system for triage in order to prioritize treatment according to the severity of the condition(s);

c.  The Medical Defendants lacked the proper education, licenses, training, experience, and/or skills to promptly and/or adequately diagnose Decedent's emergency and progressive medical condition, including but not limited to:

      i.     Failure to timely respond to the scene of the medical emergency with the necessary medical equipment, including but not limited to an oxygen tank capable of working;

      ii.    Negligently removing the Decedent from his oxygen source;

      iii.   Failure to properly and timely administer emergency medical care in accordance with American Heart Association Adult Cardia Arrest Algorithm;

      iv.   Failure to timely and properly administer Epinephrine in the correct dosage, amount, and frequency;

      v.    Failure to properly administer CPR;

      vi.   Failure to recognize and appreciate the seriousness and gravity of the Decedent's condition under the circumstances;

      vii.   Failure to understand and react effectively to Decedent's medical needs given the

circumstance; and

viii.  Failure to adhere to industry standards including but not limited to the American College of Emergency Physicians Cruise Ship Guidelines.

95. At all times material hereto, CARNIVAL knew of the foregoing conditions causing the Decedent's accident and did not correct them.  CARNIVAL's knowledge of the dangerous condition(s) was specifically acquired through prior incidents causing personal injury and/or death to CARNIVAL's passengers including but not limited to *Gaskin v. Carnival Corp.*, case no.: 22-cv-23566-CMA; *Maze v. Carnival Corp.*, 16-cv-21012-DPG; *Bersano v. Carnival Corp.*, case no.: 22-cv-23758-DPG.  Alternatively, the foregoing conditions existed for a sufficient length of time so that CARNIVAL, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.

96. As a direct and proximate result of the Medical Defendants' incompetence and lack of proper medical care, for which CARNIVAL is vicariously liable, Decedent was injured, suffered physical pain and suffering, mental anguish, and his chances of survival were dramatically decreased, leading to his death.  Decedent's estate lost earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.  In addition, Decedent lost the benefit of his vacation, cruise and transportation costs.

WHEREFORE, Plaintiff demands damages as allowed under the Death on the High Seas Act, 46 USC §30301 et seq. and/or any other applicable wrongful death and/or survival act, including but not limited to pecuniary losses, loss of support, past and future earnings, loss of services, loss of nurture and guidance of family, funeral expenses and all other damages allowable by law.  Plaintiff demands a trial by jury for all issues so triable and any other relief this Court deems proper.

## COUNT VII – GENERAL NEGLIGENCE AGAINST DEFENDANT CARNIVAL

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through forty-nine (49) as though alleged originally herein.

97. At all times material hereto, it was the duty of CARNIVAL to provide t   Decedent with reasonable care under the circumstances.

98. On or about July 21, 2022, CARNIVAL and/or its agents, servants, and/or employees breached its duty to provide the Decedent with reasonable care under the circumstances through the following acts and/or omissions:

   a. Failure to have and enforce adequate risk management procedures in place designed to reduce the occurrence of the type of accident suffered by the Decedent;

   b. Failure to have and enforce adequate risk management procedures in place designed to ensure that medical personnel, including the Medical Defendants:

      i. Timely response to medical emergencies;

      ii. Properly prioritize medical emergencies over routine Covid testing;

      iii. Are properly trained and abide by industry standards, including but not limited to the American Heart Association Adult Cardia Arrest Algorithm and the American College of Emergency Physicians Cruise Ship Guidelines; and

      iv. are properly trained to administer Epinephrine in the correct dosage, amount, and frequency during a cardiac event.

   c. Failure to have a properly equipped and manned medical facility with qualified personnel to provide medical care that did not fall below the standard of care.

99. At all times material hereto, CARNIVAL knew of the foregoing conditions causing the Decedent's accident and did not correct them.  CARNIVAL's knowledge of the dangerous condition(s) was specifically acquired through prior incidents causing personal injury and/or death to CARNIVAL's passengers including but not limited to *Gaskin v. Carnival Corp.*, case no.: 22-cv-23566-CMA; *Maze v. Carnival Corp.*, 16-cv-21012-DPG; *Bersano v. Carnival*

*Corp.*, case no.: 22-cv-23758-DPG.  Alternatively, the foregoing conditions existed for a sufficient length of time so that CARNIVAL, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.

100.    As a direct and proximate result of the Medical Defendants' incompetence and lack of proper medical care, for which CARNIVAL is vicariously liable, the Decedent was injured, suffered physical pain and suffering, mental anguish and his chances of survival were dramatically decreased, leading to his death.  The decedent's estate lost the earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.  In addition, Decedent lost the benefit of his vacation, cruise, and transportation costs.

WHEREFORE, Plaintiff demands damages as allowed under the Death on the High Seas Act, 46 USC §30301 et seq. and/or any other applicable wrongful death and/or survival act, including but not limited to pecuniary losses, loss of support, past and future earnings, loss of services, loss of nurture and guidance of family, funeral expenses and all other damages allowable by law.  Plaintiff demands a trial by jury for all issues so triable and any other relief this Court deems proper.

LIPCON, MARGULIES
& WINKLEMAN, P.A.
*Attorneys for Plaintiff*
2800 Ponce De Leon Blvd, Suite 1480
Coral Gables, Florida 33134
Telephone: (305) 373-3016
Facsimile: (305) 373- 6204

By:  */s/ Carol Finklehoffe*
**JASON R. MARGULIES**
Florida Bar No. 57916
jmargulies@lipcon.com
**CAROL L. FINKLEHOFFE**
Florida Bar No. 0015903